Morning, Your Honors. May it please the Court, my name is Timothy Sears. I'm General Counsel for the Washington State Nurses Association. I understand I have ten minutes, and I'd like to reserve about five minutes of that. Just keep an eye on that little clock right there. It's counting gallons. This case presents an issue vital to all employees in the health care industry concerning how they can exercise their Section 7 rights to self-organization and collective bargaining in the workplace. The Board's decision that's subject to review in this case would, if it's allowed to stand, effectively abolish a distinction that the Supreme Court drew between exercising Section 7 rights to communicate with coworkers in immediate patient care areas of hospitals and in all other areas of hospitals, because the employer's rule here prohibiting the wearing of a union button applies to any area of the hospital campus where an employee might encounter a patient or a family member, which would include the parking lots, the lobby, the cafeteria, essentially the entire facility, because the employer at no point indicated any particular area where employees were even allowed to wear this button. Now, this is a little bit more than a union button, isn't it? Actually, this is a very typical union button. It says RNs demand safe staffing. Staffing issues, this is the button right here. Does it have a union logo right below it? Yes, it does. I couldn't – it looked like it did. I would note, Your Honor, that the message that the employer found objectionable, the message that the NLRB here found so problematic that it's not a good idea to have a union button. The employer was permitted to ban it, is in essence the exact same union message that the Supreme Court looked at in the Beth Israel hospital case, where the hospital objected to the union's message because they said it disparaged the hospital's ability to provide adequate patient care, primarily because of understaffing. In point of fact, this issue of staffing is the central question in collective bargaining for nurses and the healthcare industry throughout the country and has been now for decades. The Beth Israel case was 30 years ago. Let me ask you a question. Why – you know, there really isn't much evidence in this record here. In fact, there's probably no evidence that there were any complaints or concerns raised by patients. Absolutely not. There's none, at least as far as I can tell. But why should an employer have to sort of wait until there are actual complaints? Well, it's not a question of whether the employer has to wait until there are actual complaints. It's a question of whether an employer can ban something and the board will uphold that based on sheer speculation. Well, can you ever imagine a situation where an employer could look at the message that's being conveyed and say, you know, look, in our judgment, in this environment, in our judgment, we think this is over the line. Well, the – it's undisputed that there's nothing about this message that's disloyal or vulgar or obscene or disloyal to the employer that's maliciously false. Any which – any of which would – might be reasonable grounds for an employer to prohibit the wearing of a button if it were vulgar or obscene or disloyal to the employer. It's none of these things. It's clearly protected by Section 7 of the Act. And here, the NLRB is not only allowing this button to be banned based on sheer speculation. There's absolutely no evidence of any problem with this button. Because, after all, before the employer issued this ban, nurses had been wearing this button throughout the hospital. How long had they been wearing it before the whole issue arose? The record shows it's at least three or four months. I'll check that. But not only that, the NLRB here is not relying on any special expertise the board has in labor relations matters. It explicitly says they're not relying on their expertise. They're deferring to management. They're letting management make this decision, and they won't second-guess management. So it's an abdication of the board's claim to special expertise in labor relations matters. And as to the button itself, they're saying there's not any special expertise involved. It's simply any reasonable person would see that this button is outrageous. Now, just a minute, counsel. It's a little uneasy to me. I mean, I normally see these appeals, and I admit I'm the baby judge here, so I haven't been here for a long time. But I generally would see these appeals with the NLRB siding with the union side of the agreement. And what is my standard of review when I review those? The question is whether the board has correctly applied the law. And if so, is their decision supported by substantial evidence in the record? Now, substantial evidence is a case-by-case analysis. Correct. A review of the whole record. Correct. Taking into account whatever in the record fairly detracts from the NLRB conclusion. Correct, yes. Now, here, the undisputed evidence is that the nurses wore these buttons for months, and there was no problem. There was no complaint. There was no issue raised about it. And the undisputed evidence is they wore buttons prior to this, but when it came to this button, which the hospital believed would be more aggressive than other buttons, I guess, I don't know, based on what Sacred Heart Memorandum suggests, then they said no more with this particular button. Now, the NLRB, who would generally be the one who would help in these situations for the union, and the standard of review, why is it they abused their discretion? Why is it that there is no substantial evidence? I'm sorry, why? Why is it that there is no substantial evidence to support this? I think they based their decision on sheer speculation, Your Honor. And I'd like to reserve the remaining portion of my time. Thank you. Good morning, Your Honor. May it please the Court, David Seif for the Labor Board. Mike Love, who filed an amicus brief, is also at counsel's table, but not reserving any argument time this morning. Union counsel mixes apples and oranges here. Its reference that the button wasn't vulgar or disloyal is calling into question something that's not before the Court this morning. That involves the Jefferson standard, a case decided by the Supreme Court back in the 1950s, over whether is there a conduct that simply loses the protection of the act, where an employee could be disciplined or discharged for engaging in such unprotected or disloyal activity. So, counsel, you're saying Sacred Heart does not challenge the administrative law judge finding that the button represents a legitimate workplace concern and is entitled to protection under Section 7? That's correct. It's entitled to some protection under Section 7, but then that then goes into the middle ground. Is there still a place restriction that the hospital can place on where the button is being worn? And what the Board did here, it looked objectively, as the Board's been doing for 60 years, whether it's cases like this or Section 881 violations like interrogations and threats, it looks objectively, and it looked on the face of the button, that the button suggests that staffing levels are unsafe and that, objectively, a reasonable person could have some issues with this. What if, in fact, that were the case, that staffing levels were dangerously low? Your Honor, if, in fact, there was, that that opinion may have actually had some validity to it, again, that's a message that they can bring out in other avenues and other forums, but it doesn't need to be given in front of the patients and family members themselves within the hospital grounds. What you're saying is they can't tell the truth? No, Your Honor. I'm simply saying that the hospital has the right not to have that being disseminated by its nursing staff where they're going to be encountering patients and families. And in the two instances, in fact, where the button was being asked to take off here, one of the nurses acknowledges that page 41 of the transcript that they were in the middle of seeing patients and another witness acknowledged that page 51 that it was in an area where patients and families are. There is no evidence of any patient complaint or concern. Is that right? That's correct, Your Honor. And, again, there doesn't need to be. In looking at the Baptist Hospital case, the Supreme Court recognized simply a situation that may have an adverse effect. The board has cited in its brief in the Pathmark case recognition simply that a button sends a message that may have or may be read as having an adverse or negative effect. That's all there needs to be. The suggestion that there needs to be somehow direct evidence really flows from what the board and dissenting member have as far as the inference drawn from the button itself. In the situation here, again, the board looked at the button itself, drew inferences and conclusions from it, and it also recognized that there was opinion and concern by a hospital supervisor. And under Baptist Hospital and the board cases, the board says that's enough. Now, the Baptist case was a case of solicitation, wasn't it? That's correct, Your Honor. But the same general concept the board is applying. Well, yes and no. To some extent. And what the dissenting board member is coming from here is a position that, no, on its face, this is just a routine run-of-the-mill button, that essentially that it's unreasonable to look at this button and make any inference or conclusion that this could cause any disturbance or issues with patients. Let me ask you a question. Were there any complaints from families that wearing the button was disruptive or caused the dialogue to take place? There is no direct evidence. And was there any report made that wearing buttons caused any disruption or interfered with patient care? Not for this particular button. Did the wearing of buttons cause a work stoppage or a sit-down strike? No, it didn't, Your Honor. Were there ever any reports of nurses discussing the buttons with patients? No, Your Honor. Were there any survey made of patients and families concerning the buttons, whether they interfered with patient care or safety? No, there wasn't. But, again, how? Now, the reason I ask you those questions, those questions come right out of Mount Clemens. All right. A sister circuit saying none of those happened, therefore no evidence, therefore NLRB no. Your Honor, and the key point, and, again, this is where the dissenting board member is coming from. It's starting from the button itself. In that case, what the board is saying, and in that case it involved a button that had FOT or the lines run through it, that on its face there an objective, reasonable person would not look at this particular button and have an issue with it. And in that case, the board is not going to put its head in the sand. It's going to recognize that, look, if on its face there's a button that would not objectively or reasonably cause an issue, but an employer or hospital comes forth, and there's an indication that in actuality this has caused problems, the board is not going to say, well, objectively we don't think. What's the indication or actuality in this case? But, Your Honor, there doesn't need to be, because, again, it flows from the button itself. The board here is distinguishing that this button is not a run-of-the-mill typical union button. It's not just simply saying support your nurses, WSMA. It's suggesting and implying that there's unsafe staffing. Let me ask you another question then. If this is your argument, how long were the buttons worn before the memorandum prohibited their wearing? It was approximately a couple of months in that period of months. Why is this button any worse than the one they wore saying, staffing crisis, nursing shortage, medical errors, real solutions? They wore that one for some months and nothing was done. It seems a little more aggressive. Staffing crisis, nursing shortage, medical errors, real solutions? Your Honor, first of all, the fact that other buttons were allowed certainly does demonstrate that the hospital is not trying to completely limit any message relating to union issues that the union might have had with the hospital. And that whether they allowed one button over another, that is their business judgment. And we also, in the record, really don't know, compared to one button over the other, how frequently one was being worn compared to another one. And it's also reasonable, if you do look at the buttons, the safe staffing button rather clearly and ambiguously states RNs demand safe staffing, the button that was just referred to. So is the offensive word here safe? What if it said RNs demand adequate staffing? Your Honor, I wouldn't necessarily characterize it as an offensive word. Well, that's what seems to be of concern. It's a characterization that demanding safe staffing leads objectively to a reasonable inference that the nurses are suggesting that staffing levels in the hospital are not safe. So it would be okay to say RNs demand adequate staffing? Your Honor, arguably the Board could have reached the same result on that. Again, it would be an inference suggesting that there isn't safe staffing. But the union needs to be able to demonstrate to the Board, not just that there's two potential ways to look at the button. On the one hand, that it was just a routine button, no different than any other button. And as the Board majority found it, no, on its face, objectively, this is a button that could reasonably infer that there's unsafe staffing and reasonably upset a patient or family member. It's not enough to simply say there's two views of the button. Maybe we have to show there's only one view of the button, that there's no reasonable objective way that the Board could have looked at the safe staffing button and drawn the conclusions that it did. Do you have any case where there wasn't some evidence of patient distress or family member distress? Where they didn't allow the button? Do you have any case? Not that I'm aware of, Your Honor, because, again, the Board, whether it's in a case such as this or dealing with interrogations or threats, it's an objective standard. The Board, in its 60 years, it doesn't look subjectively at subjective reaction. And the only reason that it's doing so, or at least looking a little bit deeper in the cases like St. Luke's Hospital and now St. Clement's General Hospital, is saying that on its face there's a very generic button. And, in fact, in the Mount Clemens Hospital case with the line with the FOT drawn through it, it was found to be so innocuous that that button could even be worn in front of patients and families in a hospital setting as far as patient rooms. So, in other words, no restriction, that there can even be a distinction between immediate patient care and non-immediate patient care. In Mount St. Clemens, it was found so generic that that could be worn anywhere. In this case, the hospital, excuse me, the union doesn't even seem to be disputing that there can at least be some sort of distinction made. And, again, that's where everything really flows from is the inference you drew from the button. And, again, the Board isn't going to keep its head in the sand. If something on its face doesn't appear to be objectionable, if an employer can come back and show that, in fact, there's a problem that has arisen or there's actual evidence, then the Board isn't going to force the employer or the hospital to put up with whatever disturbance might be created. But if on its face you have something that objectively can be objectionable, the hospital simply doesn't need to accept that in areas where patients or the families might say it. But you understand that what we're really talking to you about is Beth Israel, right out of the Supreme Court, which says mere speculation is not enough. Got to give us some evidence. Then you've got some NLRB precedent in London Memorial Hospital and Luke's Hospital about complaints. And then, after you get through with London Memorial and St. Luke's, then we're back to our sister circuit's decision in Mount Clemens, and that's why we keep pressing these kind of things. We can't find the precedent to go where you want to go except some, well, we think it's there, and then we go look at what else is there, and we say, why can we say that? I see that my time is up. You can answer. I don't want to be repetitive, but I would emphasize that Baptist Hospital states that it may adversely affect. A very active solicitation in certain places may adversely affect, and it can then be limited. And here, again, we're dealing with objectively, and it's enough to look at the button and objectively state that this is a message. It's not mere speculation when one is looking objectively at what the button says. If it was a completely generic button, like the line of the FOT with a line slashed through it, then, again, the board is going to look a little bit deeper, because on its face, on an objective basis, one cannot look at the button and surmise or infer that a patient or family member could have an issue with it. And so what we're ultimately dealing with is the inference that the board drew from this button. We understand. Thank you. Let's see. You have some time for rebuttal. Two minutes, I believe. Thank you, Your Honors. As you raised, Your Honor, the board's theory in this case, if applied generally, would mean that workers in the health care industry can be prohibited from ever raising an issue about safety and health in their workplaces. That to put out a button that quoted the language of the Occupational Safety and Health Act to say, RNs demand a safe and healthful workplace, would, by the same theory, be objectionable and could be banned by the employer anywhere on the property where they might run into patients or their family members. We think this is overbroad. We think it interferes with employees' Section 7 rights in a profound way. And perhaps the most disturbing aspect of the board's decision is its abdication to the employer of the right to make the decision about whether or not a particular union message is objectionable. The board in its decision expressly says, we will not second-guess the employer's business judgment about what union messages are objectionable. And as the Supreme Court noted in the Beth Israel Hospital case, it's not surprising or unnatural that an employer's assessment of the need for a particular restrictive practice on union messages might overcompensate its goals and give too little weight to employee organizational interests. That's what's happening here, where the board is essentially abdicating its role to the employer and saying we won't second-guess the employer's business judgment about what rights the employees have to communicate with each other and with the public. Thank you. Thank you. The matter will be submitted, and we do appreciate counsel's arguments. Thank you.
judges: Fletcher, Paez, Smith